(No. 48807.)

MASTER LEAKFINDING CO. *et al.*, Appellees, v. THE INDUSTRIAL COMMISSION *et al.*—(Vinson Kreimeier, Appellant.)

*Opinion filed September 20, 1977.*

Lewis P. Gaines, of Chicago, for appellant.

Gordon, Brustin and Schaefer, Ltd., of Chicago (Gilbert W. Gordon and Robert E. Gordon, of counsel), for appellees.

MR. JUSTICE MORAN delivered the opinion of the court:

On December 15, 1972, claimant, Vinson Kreimeier, was injured when he fell behind the building in which he worked, and lay on the snow for hours during a bitterly cold winter night. He brought this action against Master Leakfinding Co. (Master) and Aetna Insurance Co. before the Industrial Commission for benefits under the Workmen's Compensation Act (Ill. Rev. Stat. 1971, ch. 48, par. 138.1 *et seq.*). After a lengthy hearing at which 11 witnesses testified, the arbitrator determined that, on the date in question, there existed an employer-employee relationship between Master and Kreimeier, that Kreimeier had sustained accidental injuries on that date, that timely notice of the accident was given, that Kreimeier's earnings for the preceding year were $15,600 and his average weekly wage $300. The arbitrator found, however, that Kreimeier's injuries did not "arise out of and in the course of his employment by the Respondent herein." On review, the Commission heard corroborative testimony from Mrs. Kreimeier and received evidence of additional medical

expenses incurred after the date of the initial proceedings. The Commission reversed the arbitrator's decision, found that Kreimeier was permanently and totally disabled, and held that the accidental injuries arose out of and in the course of his employment. It ordered Master to pay Kreimeier's medical expenses of $21,342.71 and a sum of $73 per week for 295 weeks, plus $65 for one week, to be followed thereafter for life by an annual sum of $2,592 payable in equal monthly installments. The circuit court of Cook County reversed. The only issue on appeal is whether the circuit court properly reversed the Commission's decision as being against the manifest weight of the evidence.

Kreimeier was the president and sole shareholder of Master. His wife served as corporate secretary. Kreimeier was the company's only employee from July 1972 through the date of the accident, although, prior to that time, there had been additional employees. Master was incorporated in 1966 for diverse stated purposes, *e.g.*, to find leaks in pipes and facilities used for liquids and gases, to "purchase, improve, develop, lease, exchange, sell and otherwise deal in and turn to account, real estate," and to "finance the purchase, improvement, development, and construction of land and buildings belonging to or to be acquired by this company or any other person, firm, or corporation." Until July of 1972, the corporation was devoted primarily to the first stated corporate purpose: finding liquid and gas leaks. Kreimeier himself functioned as general manager, consulting with municipal clients regarding leaks, hiring, training, and scheduling technicians to perform the work, and making progress reports to the clients. He testified that during the six months prior to the accident his duties as Master's general manager were "very, very limited," that he hired no employees during that time, and that he functioned primarily on a consulting basis. During this period, he concentrated his efforts on an attempted

rezoning of a lot adjacent to Master's old corporate headquarters in Elmhurst. Kreimeier owned this lot under a land trust. Pending the hoped-for rezoning, Kreimeier had temporarily relocated his business office in an old house at 15 N. Grant, Hinsdale, sharing occupancy with the architectural firm of Scoggins & Associates, which held a lease on that building. Scoggins and Kreimeier anticipated that after the Elmhurst property was rezoned, a Scoggins-designed office building would be built on the two contiguous lots.

Scoggins testified there was an equal partnership arrangement between himself and Kreimeier, individually, for the development of that office facility: Kreimeier was to donate the land and Scoggins was to donate his professional services as architect. It was intended that Master and Scoggins & Associates, among others, would have office space in the proposed building.

Evidence was in conflict as to whether Kreimeier paid rent for the use of the office at 15 N. Grant during the period of July to December, 1972. Kreimeier testified he paid Scoggins "probably maybe $50 per month, something like that" in rent, but Scoggins testified that no rent was paid by Kreimeier individually, or by Master, it being neither asked for nor refused. Scoggins acknowledged that Kreimeier occasionally contributed small amounts of money toward office expenses such as stationery and postage. Scoggins also testified that during this period he dealt only with Kreimeier individually, not with the corporation, Master. It was shown, however, that Scoggins had received a check from a Master's account, reimbursing him for expenses related to the rezoning. Scoggins also acknowledged he was aware that mail addressed to Master was delivered to 15 N. Grant. Prior to the date of the injury, a public liability insurance policy was purchased by Kreimeier on 15 N. Grant, the policy being in the names of Master and Scoggins & Associaties, as well as in the names

of Kreimeier and Scoggins individually. From the city zoning files, there was introduced a letter regarding the pending rezoning, the same written by Kreimeier on Master's stationery. The letter was dated December 13, 1972, but the date it was received by the city was not determined.

Kreimeier testified that on the evening of the occurrence he worked alone in his office at 15 N. Grant. He stated that he prepared letters to numerous area residents to keep them abreast of developments on the proposed rezoning, and also prepared some materials for consideration of the planning commission which was to meet the · following day, Saturday, December 16. (Scoggins was in the office with Kreimeier until 7 p.m., and corroborated the latter's testimony as to activities in the office earlier that evening.) About 8:30 p.m., Kreimeier called his wife and told her he was leaving the office, that he intended to mail some letters at the post office and deliver some documents at the Elmhurst city hall before coming home. (There were inconsistencies between this testimony and Kreimeier's earlier recorded statements to the insurer in which he said he was leaving to see a client when the accident occurred.) According to his testimony, Kreimeier banded the letters and, taking them, a bag of wastebasket trash and his briefcase, went down stairs, exited and locked the office building, and started down a short flight of stairs toward the parking area.

The night was bitterly cold, and the snow was glazed with an icy crust that would support a person's weight. Although the steps had been shoveled and salted earlier by Kreimeier, some ice remained. Kreimeier lost his balance, and his briefcase apparently came up and struck his head. He fell forward and struck his head again on the wrought iron stair railing as he went down. He lost consciousness and was found after midnight by his wife (who had become alarmed by his failure to return home) lying face

down, frozen to the crusted snow. His wife testified that she found him at the bottom of the incline which leads from the office steps to the parking area, that she found the keys on the ice and noticed his briefcase and a plastic bag of wastepaper trash in the immediate vicinity. She let herself into the office and called the police, who responded quickly and called an ambulance. The attendants scooped Kreimeier up, snow and all, in a special stretcher and transported him to the hospital. According to Mrs. Kreimeier, the briefcase was put into the ambulance along with her husband. Kreimeier stayed in the emergency room for about 45 minutes and was then admitted to the intensive-care unit where he stayed for five days. It is undisputed that his injuries are severe and permanent.

Various witnesses gave testimony that conflicted with Kreimeier's account of his activity. Elmhurst's city attorney testified that no meeting regarding the Kreimeier rezoning was pending for the morning of Saturday, December 16, that no meetings had been scheduled for the evening of December 15, and that the normal operating hours of the city hall were 8:30 a.m. to 5 p.m. His testimony further indicated that, by December 15, all of the evidence was closed on all sides. The city documents and the record indicate the planning commission had already determined its recommendation with regard to the subject rezoning and all that remained was a formal vote of the city council, which vote was to take place on Monday, December 18. Apparently referring to Master's December 13 letter to the city, however, the city attorney remarked that "there was a last-ditch attempt *** usual in a zoning case, to sustain the zoning or to grant the zoning." The two police officers and two ambulance attendants who responded to the December 15 call to the scene testified they saw no briefcase, letters, or bag of trash in the vicinity of the accident. One of the attendants testified that there might have been some garbage.

Scoggins testified that Kreimeier had telephoned him three times during the evening of the accident and that, by the last call (at 10:30 p.m.), he noticed Kreimeier's speech was slurred. Having on previous occasions heard Kreimeier's speech when the latter was under the influence of alcohol, Scoggins concluded that at the time of the last phone call Kreimeier was drunk. Scoggins testified he found Kreimeier's briefcase and the letters Kreimeier had been working on on the latter's desk the morning following the incident. There, too, was an empty scotch bottle which, according to Scoggins, had been one-half to three-quarters full the day of the accident. A notation on Kreimeier's hospital admission record indicated that his breath smelled of alcohol, although Kreimeier testified he had had only a single martini more than seven hours prior to his admission to the hospital.

Two requirements of the Workmen's Compensation Act are critical to this case. For injuries to be compensable, the claimant must demonstrate (1) the existence of an employer-employee relationship on the date of the injury, and (2) that his injuries arose out of and in the course of his employment. Master and its insurer, Aetna, claim the Commission's decision, holding that Kreimeier established these facts, was against the manifest weight of the evidence. They also assert that this court is entitled to, and should, accept the arbitrator's findings of fact (that Kreimeier's injuries did not arise out of and in the course of his employment) in preference to the Commission's contrary findings, because the arbitrator was in a superior position to judge the credibility of the witnesses whose testimony was in conflict in this regard.

It is clear that, "[o]n review, a court will not reject permissible inferences drawn by the Commission because different inferences might also have been reasonably drawn, nor will it substitute its judgment for that of the Commission unless the findings are contrary to the

manifest weight of the evidence." (*Illinois Valley Irrigation, Inc. v. Industrial Com.* (1977), 66 Ill. 2d 234, 239.) It is equally clear that "[i]n reviewing a decision of an arbitrator the Commission exercises original and not appellate jurisdiction and is not bound by the arbitrator's findings. [Citation.] This is true whether or not the Commission considers additional evidence on review. *** When the arbitrator and the Commission reach different conclusions, a court will not overturn the Commission's decision unless it is contrary to the manifest weight of the evidence." *Illinois Valley Irrigation, Inc. v. Industrial Com.* (1977), 66 Ill. 2d 234, 239.

Both the arbitrator and the Commission found that an employer-employee relationship existed on the date of the accident. Kreimeier's testimony was uncontradicted that such relationship existed, and that he was paid $300 a week for consulting with clients and for other services performed as general manager of Master. This court is clearly not in a position to say, in light of these facts, that the existence of an employer-employee relationship is against the manifest weight of the evidence.

It is likewise uncontradicted that on the evening in question Kreimeier worked on some letters and/or documents relating to the rezoning of property, and that the purpose of the rezoning was to improve the property with a building in which to house, among others, Master. This was testified to not only by Kreimeier, but also by Scoggins. The doubtful aspects of Kreimeier's testimony regarding his activity on the rezoning papers concern what specific person, if any, was to be present at the city hall to receive the documents on that night. We do not believe this to be a material aspect affecting the otherwise established fact that Kreimeier was working on the documents and/or letters prior to the accident.

It is asserted by Master that because the property to be rezoned belonged to Kreimeier individually, and be-

cause Scoggins testified to having dealt only with Kreimeier individually, Kreimeier was actually the subtenant at 15 N. Grant, and the rezoning work was not Master's work, but Kreimeier's individual pursuit. We find, however, that in view of the stated purpose in Master's articles of incorporation (to "finance the purchase, improvement, development, and construction of land and buildings belonging to or to be acquired by this company or any other person, firm, or corporation") and in view of both Kreimeier's and Scoggin's testimony that Master was to be a tenant in the proposed building to be built on the very site of Master's prior corporate headquarters, the Commission could reasonably have concluded that Kreimeier was engaged in Master's business, notwithstanding that he might individually benefit therefrom. Moreover, though Scoggins stated he dealt with only Kreimeier individually, he nevertheless acknowledged taking a Master's check as reimbursement for expenses of the rezoning. Additionally, there was in the city zoning records a letter regarding the rezoning, such letter written by Kreimeier on Master's letterhead.

Master urges that should the rezoning activity be deemed work done in behalf of Master, as distinguished from work done in Kreimeier's individual interest, the same was an executive function distinct from those of an employee. Under the dual-capacity doctrine, Master asserts that Kreimeier may not receive workmen's compensation for injuries received while working in an executive capacity. See *Parro Construction Corp. v. Industrial Com.* (1970), 45 Ill. 2d 367.

While the actual decision to rezone may have been purely an executive function, the routine tasks of the evening in question—sending informational letters to nearby residents and preparing documents for the city urging a rezoning—may be deemed duties which the company might hire someone to perform. The fact that Kreimeier,

the company's sole employee at this time, performed those duties does not transform those functions into executive duties. As in the *Parro* case, we believe the facts permit a reasonable inference either way as to whether the defendant was performing the duties of an employee or was acting within his executive capacity. Where the evidence, together with the inferences that might have been drawn from it, clearly permit a finding that the claimant was acting as an employee, this court will not interfere with the finding of the Commission. *Parro Construction Corp. v. Industrial Com.* (1970), 45 Ill. 2d 367, 372-73.

Master further urges that Kreimeier did not show that he was injured on premises which were under the maintenance and control of Master. The evidence creates some doubt as to the exact location of the accident. (Kreimeier was found at the bottom of the slope in the parking lot, a number of feet from the stairs on which he assertedly fell.) Master's argument is therefore essentially two pronged. If it is assumed that the accident occurred on the stairs, there was not sufficient evidence to show that Master was a subtenant of the premises at 15 N. Grant. If instead, it is assumed that the accident took place in the parking lot, it was not demonstrated that the parking lot was owned and controlled by Master (*Maxim's of Illinois, Inc. v. Industrial Com.* (1966), 35 Ill. 2d 601, 604), or that the accident occurred as a result of conditions on those premises.

As to the first portion of that argument, we believe there are sufficient facts to reasonably support a conclusion that Master was a subtenant in 15 N. Grant. Kreimeier testified he paid Scoggins for the use of the premises; Master received mail there; a public liability insurance policy on the premises existed in the names of Master and others; and, although Scoggins denied that he received rent from Kreimeier, he admitted the latter contributed toward minor office expenses. The Commission could have be-

lieved Kreimeier's testimony that he slipped and fell on the icy stairs while leaving the premises leased by Master. In that instance, the ownership or control of the parking lot where Kreimeier came to rest is irrelevant.

As to the second portion of Master's argument, if it were assumed that the accident occurred on the parking lot rather than the stairs, uncontradicted evidence showed that Kreimeier customarily parked his car in the lot, that the lot sloped, and that it was covered with ice-crusted snow on the evening in question. In light of the asserted subtenancy of the building, the location of the parking lot and its customary use, it is permissible to conclude that the accident occurred as a result of conditions on a parking lot provided for Master's employees (*De Hoyos v. Industrial Com.* (1962), 26 Ill. 2d 110, 113), notwithstanding the evidence that Kreimeier had been drinking before the accident (*M & M Parking Co. v. Industrial Com.* (1973), 55 Ill. 2d 252, 257-58).

Although we might have come to a different conclusion as to the cause of Kreimeier's fall were we the trier of fact in this case, we cannot say that the Commission's conclusion was against the manifest weight of the evidence. *Illinois Valley Irrigation, Inc. v. Industrial Com.* (1977), 66 Ill. 2d 234, 239.

For these reasons, the judgment of the circuit court is reversed and the award of the Industrial Commission is reinstated.

*Judgment reversed;*
*award reinstated.*